## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 18 2016, 8:33 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Erin L. Berger
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorney Generals
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In Re the Matter of the Termination of the Parent-Child Relationship of: | October 18, 2016 |
| G.S. and B.S. (Minor Children), | Court of Appeals Case No. 82A04-1604-JT-815 |
| And | Appeal from the Vanderburgh Superior Court |
| N.S. (Father), | The Honorable Brett J. Niemeier, Judge |
| *Appellant-Respondent,* | The Honorable Renee A. Ferguson, Magistrate |
| v. | Trial Court Cause Nos. 82D04-1509-JT-1530 & 82D04-1509-JT-1531 |
| The Indiana Department of Child Services, | |
| *Appellee-Petitioner.* | |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, N.S. (Father), appeals the trial court's Order terminating his parental rights to his two minor children, G.S. and B.S. (collectively, the Children).

We affirm.

## ISSUE

Father raises one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented sufficient evidence to support the termination of his parental rights.

## FACTS AND PROCEDURAL HISTORY

Father and A.S. (Mother) have been together since approximately 1999 and are married. They are the biological parents of two daughters: G.S., born October 4, 2001, and B.S., born January 15, 2004.[1] In July of 2008, the Children were removed from Father and Mother's custody for a period of time after DCS substantiated allegations of neglect, lack of supervision, and endangerment. Although the Children were returned to their care, Father and Mother continued to struggle with providing for the Children's needs. In early 2014,

---

[1] On December 8, 2015, Mother's parental rights to the Children were terminated. Mother is not a party to this appeal, although facts pertaining to her are included where appropriate.

DCS received multiple reports which alleged that the Children were being neglected and that the family was homeless. DCS was unable to maintain contact with the family due to their transience.

[5] Again, in July of 2014, the Vanderburgh County DCS office received information that Father and Mother, along with the Children, had been homeless for approximately six weeks. The reporting source indicated that Father was incarcerated, and Mother, who was unemployed, had caused the family to forfeit their lodging at the YWCA shelter by smoking in her room. The report indicated that after they were kicked out of the YWCA, Mother and the Children "bounc[ed] from house to house." (DCS Exh. 4, p. 5). DCS commenced an investigation but had difficulty making contact with Mother and the Children because their living arrangements were unknown. However, DCS learned that Mother had an upcoming court hearing on a petition to revoke her probation in her Class B felony case for stealing prescription drugs. Thus, on July 24, 2014, DCS made contact with Mother at the Vanderburgh County Circuit Court. Mother informed DCS that she had been staying at several motels, the YWCA, and with her brother; however, twelve-year-old G.S. was staying with friends. Mother indicated that she was attempting to secure an apartment for herself and the Children. On July 28, 2014, Mother notified DCS that she and the Children would be moving in with the Children's maternal grandfather (Grandfather) until she could find suitable housing. Mother also indicated that Father had recently been released from incarceration.

[6]     On July 30, 2014, DCS filed a petition alleging each of the Children to be a child in need of services (CHINS). In part, DCS claimed in the CHINS petition that Father and Mother had failed to maintain stable housing for the Children, and both parents were unemployed. During a hearing on July 31, 2014, Father and Mother admitted to the allegations contained in the CHINS petition, and the trial court adjudicated each of the Children to be a CHINS. Initially, the trial court ordered the Children to remain in their parents' care, living in Grandfather's home. However, DCS subsequently determined that Grandfather's one-bedroom apartment was not appropriate for the Children, and this housing situation was unstable. As such, on August 22, 2014, DCS removed the Children from their parents' custody and placed them in foster care.

[7]     On August 26, 2014, the trial court held a dispositional hearing and issued a dispositional decree, ordering Father to participate in various DCS services. In particular, the trial court directed Father to

> cooperate with parent aide programs, [comply with] random drug screens, [attend] supervised or monitored visitation [with the Children], remain drug and alcohol free, sign all releases of information, cooperate with all services through probation, maintain weekly contact with DCS family case manager, and do not move residence[s] without first notifying the DCS family case manager.

(DCS Exh. 4, p. 19). Pursuant to the Parental Participation Plan, Father also agreed to "demonstrate the ability to rehabilitate and appropriately care for the [Children]" by, in relevant part,

> [p]roviding the [Children] with adequate, safe supervision at all times while in [Father's] care; . . . [s]ecuring and maintaining adequate, stable housing that is kept safe for the [Children]; . . . [c]ooperating with [DCS] and the recommended scheduled sessions for the [Children's] visitation, therapy, group sessions, and rehabilitation[] sessions; . . . [k]eeping [DCS] informed of any change of address, change of employment, change of telephone or cell phone number and/or change of household composition within [forty-eight] hours of the change; . . . [and] [o]beying the law.

(DCS Exh. 4, p. 22).

[8] For the next year, Father failed to comply with any aspect of his court-ordered case plan. DCS provided Father with a parent aide in order to assist him with housing and employment, but Father "never met with the parent aide, not even once." (Tr. pp. 47-48). Father was also ordered to submit to random drug screens based on a "history of drug use and concerns when [DCS became] involved, that there was active drug use as reported by other family members and the [C]hildren." (Tr. pp. 51-52). However, Father failed to appear for nearly all of his drug screens. By his own admission, Father willfully refused to comply with the order for drug testing because "I don't do any drugs so I got stubborn." (Tr. p. 27). Nevertheless, the "couple" of drug screens to which Father did submit were negative for any illicit substances. (Tr. p. 49).

[9]  Father was expected to attend supervised visitations with the Children at least twice per week by his recollection. Although Father "acted appropriately" when he visited with the Children, he attended "less th[a]n half of the visits that [DCS] offered throughout the case." (Tr. p. 49). Father attributed his lack of attendance, in part, to the fact that he had an active arrest warrant and "was kinda hiding out." (Tr. p. 12). Father further explained that he has not had a valid driver's license since 2008, and although he owned a vehicle, the license plate was expired. While Father admitted that he drove his vehicle "here and there," he indicated that he did not want to take that same risk by driving to visit with his Children. (Tr. pp. 26-27). At times, Father used public transportation, and he noted that the visitation facility was along the bus route. Yet, Father "never took a bus" to attend his visitation sessions. (Tr. p. 27).

[10]  Father has a significant criminal record, and throughout the case, he was incarcerated "on and off." (Tr. p. 50). By Father's own estimate, he was incarcerated for four or five months in each of 2014 and 2015. Despite DCS' advice to write letters to the Children during his stints of incarceration, Father did not communicate with the Children. During the intervals that Father was not incarcerated, DCS attempted to engage him in his mandatory services, but Father made no effort to comply. Father frequently changed residences—moving between motels and houses every few months—without notifying DCS. Notwithstanding his obligation to maintain weekly contact with DCS, Father never called DCS "at all throughout the case." (Tr. p. 48). DCS' attempts to contact Father were futile as Father's phone either did not work or he did not

answer it, and DCS was unable to keep track of Father's ever-changing address. Furthermore, Father never secured employment, and he never achieved stable housing. In June of 2015, Father was found to be in contempt of court based on his non-compliance with DCS and his case plan.

[11] On September 1, 2015, DCS filed a petition to terminate Father's rights to the Children. On December 15, 2015, the trial court conducted a hearing on the termination of Father's parental rights. At the time of the hearing, Father had been incarcerated for two months on a petition to revoke probation in his Level 6 felony fraud case. He indicated that he lacked an understanding as to what his obligations had been throughout the case, and he testified that he did not want to give up his parental rights because he loves the Children "[w]ith all [his] heart." (Tr. p. 33). However, DCS testified that Father failed to comply with his court-ordered case plan and made no effort toward reunification with the Children. The Children's court-appointed special advocate (CASA) testified that the Children have thrived in their foster care placement; they are bonded to their foster parents, and the foster parents wish to adopt them. Both DCS and the CASA recommended that termination of Father's parental rights would be in the best interests of the Children. On March 29, 2016, the trial court issued its Findings of Fact and Conclusions of Law, terminating Father's parental rights to the Children. The trial court concluded, in part, that there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside of Father's custody will not be remedied; there is a reasonable probability that the continuation of the parent-

child relationship poses a threat to the Children's well-being; and termination of Father's parental rights is in the Children's best interests.

Father now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

Father challenges the trial court's termination of his parental rights. It is well settled that "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty issues.'" *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). In fact, "the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Accordingly, the Fourteenth Amendment to the United States Constitution safeguards "the traditional right of parents to establish a home and raise their children." *Id.* However, "parental rights are not absolute and must be subordinated the child's interests." *Id.* (quoting *In re I.A.*, 934 N.E.2d at 1132) (internal quotation marks omitted). Thus, parental rights may be terminated if the "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d 1257, 1259-60 (Ind. 2009). Indiana courts are mindful that "termination of parental rights remains an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

On review of a trial court's termination of a parent's rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Instead, we will consider only the evidence, along with any reasonable inferences derived therefrom, that are most favorable to the judgment. *Id.* Additionally, the trial court issued specific findings of fact and conclusions thereon in granting DCS' petition to terminate Father's parental rights. Accordingly, we apply a two-tiered standard of review: "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). We will find clear error only "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Requirements for Termination of Parental Rights*

In order to terminate a parent's rights, DCS must prove, in relevant part

    (A)    that one (1) of the following is true:

        (i)    The child has been removed from the parent for at least six (6) months under a dispositional decree.

    * * * *

(B)     that one (1) of the following is true:

    (i)     There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)     There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

\* \* \* \*

(C)     that termination is in the best interests of the child; and

(D)     that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS bears the burden of establishing each of these elements by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260. "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Id.* at 1261 (citation omitted) (quoting *Bester*, 839 N.E.2d at 148) (internal quotation marks omitted).

### III. *Evidence to Support Termination*

On appeal, Father does not challenge the trial court's conclusions that the Children have been removed from the home for the requisite period of time; that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Children's well-being; that termination is in the Children's best interests; or that DCS has established a satisfactory plan for the Children's care and treatment. Rather, he contends *only* that there is insufficient evidence to support the trial court's determination that there is a reasonable probability that the conditions which resulted in the Children's removal and continued placement outside the home will not be remedied.

As previously mentioned, DCS is required to prove each element of Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence. *Id.* at 1260. Because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS is only required to establish a reasonable probability that *either* the conditions resulting in the Children's removal will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Children's well-being. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Here, Father challenges only the remediation of the conditions resulting in removal and does not assert that the trial court erroneously concluded that the continuation of the parent-child relationship poses a threat to the Children's well-being; thus, he has effectively conceded that this element was satisfied. Moreover, because he has not challenged any other element set forth in the

statute, Father has essentially agreed that DCS presented sufficient evidence to support the termination of his parental rights.

[18] Nevertheless, we will address Father's argument that there was insufficient evidence to support the trial court's conclusion that the conditions resulting in the Children's removal will not be remedied. In making a determination that conditions resulting in a child's removal and continued placement outside of the home will not be remedied, we first identify the conditions that led to the removal, and we next decide "whether there is a reasonable probability that those conditions will not be remedied." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013)). In considering whether the conditions will be remedied, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* (citation omitted) (quoting *Bester*, 839 N.E.2d at 152 & *K.T.K.*, 989 N.E.2d at 1231) (internal quotation marks omitted). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987

N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[19] Here, the Children were removed from Father's custody based on a persistent inability to provide stable housing and his lack of employment/income to provide for the needs of the Children. Thereafter, the Children remained placed in foster care due, in part, to the fact that Father failed to comply with his DCS case plan to attain stable housing and employment. As to whether there is a reasonable probability that those conditions will be remedied, Father simply asserts that

> [a]t the time of the fact[-]finding hearing, [he] was incarcerated. No evidence was presented regarding [Father's] release date, or how long permanency for the [C]hildren would be delayed had the trial court denied the [termination petition] to give [Father] the opportunity to complete his sentence, be released from incarceration, and then have the ability to participate in services aimed at giving him the chance at parenthood. Due to [Father's] incarceration he was not able to engage in services aimed toward reunification with his [C]hildren between the months of October[] 2015, and the fact[-]finding hearing in December[] 2015. The trial court proceeded to terminate [Father's] parental rights without considering the length of time [Father] would remain incarcerated.

(Appellant's Br. pp. 9-10). In support of his argument, Father relies on *K.E.*, 39 N.E.3d at 648, in which the supreme court stated that "Indiana courts have upheld parental rights of incarcerated parents who still had a year or more to serve before possible release, and we have not established a bright-line rule for when release must occur to maintain parental rights."

[20] We agree with Father that, like any other parent, an incarcerated parent should have the opportunity to remedy the conditions that resulted in a child's removal from the home. *See id.* In *K.E.*, our supreme court reversed the trial court's termination order of a parent who was incarcerated at the time of the child's removal and remained so through the termination hearing. *K.E.*, 39 N.E.3d at 647, 652. Although the father was not set to be released from incarceration for two years after the termination hearing, the supreme court found that the father had "made substantial efforts towards bettering his life through [twelve] programs that ["targeted parenting and life skills, along with addressing substance abuse," which] were available during his incarceration" and which were completed voluntarily and did not result in sentence reductions. *Id.* at 648-49. In addition, the father in *K.E.* maintained regular contact and visits with his children while incarcerated, and he testified that he had made arrangements for housing and employment upon his release. *Id.* at 647.

[21] It is well established that the trial court may "consider services offered to the parent by [DCS] and the parent's response to those services[] as evidence of whether conditions will be remedied." *A.D.S.*, 987 N.E.2d at 1157. In the present case, unlike the parent in *K.E.*, Father had extended periods where he was not incarcerated, during which times DCS offered services designed to reunite him with the Children. As the trial court found:

> . . . Father admitted that he was incarcerated at various times throughout this case, but when he was free, he did not comply with services. . . . Father admitted that he did not submit to random drug screens, did not meet with the parent aide to work

> on housing, employment, or transportation, did not participate in visits with the [C]hildren, and did not attempt to maintain contact with [DCS].

(Appellant's App. p. 31). The trial court further found that Father has a substantial history of criminal behavior, unemployment, and lack of housing, and Father has taken no steps to remedy any of these issues.

[22] We find that Father's refusal to comply with DCS during the intervals that he was not incarcerated illustrates "a deep-seated disregard of the [C]hildren's needs and of any attempt to remedy" the lack of stability that resulted in the Children's removal. *In re E.M.*, 4 N.E.3d at 645. Thus, his case is readily distinct from *K.E.* and other cases in which our courts have delayed the termination of incarcerated parents' rights. *See, e.g., In re J.M.*, 908 N.E.2d 191, 192, 195-96 (Ind. 2009) (affirming the trial court's denial of a petition to terminate parental rights where both parents, while incarcerated, took steps to establish a stable environment for the child upon their release from incarceration, such as by completing "all of the available required self-improvement programs ordered by the court's dispositional decree"; securing appropriate housing; completing a bachelor's degree; and obtaining employment, such that the parents' "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time" and "the child's need of permanency is not severely prejudiced"). Here, despite the fact that the Children were removed from the home for approximately sixteen months by the time of the termination hearing,

Father never made any effort to achieve stability for the Children. "[C]hildren cannot wait indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d at 648 (quoting *K.T.K.*, 989 N.E.2d at 1235). Accordingly, the trial court did not err in concluding that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement outside of the home will not be remedied.

## CONCLUSION

Based on the foregoing, we conclude that there is sufficient evidence to support the trial court's termination of Father's parental rights to the Children.

Affirmed.

Bailey, J. and Barnes, J. concur